# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# BRYSON CITY DIVISION

## CIVIL CASE NO. 2:08cv033

| | |
|---|---|
| KENNETH WAYNE BRADSHAW, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **MEMORANDUM OF** |
| vs. ) | **DECISION AND ORDER** |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**THIS MATTER** is before the Court on the Plaintiff's Motion for Summary Judgment [Doc. 13] and the Defendant's Motion for Summary Judgment [Doc. 15].

## I. PROCEDURAL HISTORY

The Plaintiff Kenneth Wayne Bradshaw applied for Social Security disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") benefits on February 3, 2005 with a protected filing date of January 10, 2005, alleging that he had become disabled as of January 1, 2000. [Transcript ("T.") 78, 387]. The Plaintiff subsequently amended his onset date to June 1, 2002. [T. 43]. The Plaintiff's application was denied initially and on reconsideration.

[Tr. 49-51, 381-4, 45-6, 375-8]. A hearing was held before Administrative Law Judge ("ALJ") Ivar Avots on December 19, 2007. [T. 402-28]. On February 29, 2008, the ALJ issued a decision denying the Plaintiff benefits. [T. 10-31]. The Appeals Council denied the Plaintiff's request for review, thereby making the ALJ's decision the final decision of the Commissioner. [T. 5-8]. The Plaintiff has exhausted his available administrative remedies, and this case is now ripe for review pursuant to 42 U.S.C. § 405(g).

## II. STANDARD OF REVIEW

The Court's review of a final decision of the Commissioner is limited to (1) whether substantial evidence supports the Commissioner's decision, see Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), and (2) whether the Commissioner applied the correct legal standards, Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). The Court does not review a final decision of the Commissioner de novo. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

The Social Security Act provides that "[t]he findings of the [Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). The Fourth Circuit has defined "substantial evidence" as "more than a scintilla and [doing] more than creat[ing] a suspicion of the existence of a fact to be established. It means

2

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986) (quoting Perales, 402 U.S. at 401, 91 S.Ct. at 1427).

The Court may not re-weigh the evidence or substitute its own judgment for that of the Commissioner, even if it disagrees with the Commissioner's decision, so long as there is substantial evidence in the record to support the final decision below. Hays, 907 F.2d at 1456; Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

## III. THE SEQUENTIAL EVALUATION PROCESS

In determining whether or not a claimant is disabled, the ALJ follows a five-step sequential process. 20 C.F.R. §§ 404.1520, 416.920. If the claimant's case fails at any step, the ALJ does not go any further and benefits are denied. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

First, if the claimant is engaged in substantial gainful activity, the application is denied regardless of the medical condition, age, education, or work experience of the applicant. 20 C.F.R. §§ 404.1520, 416.920. Second, the claimant must show a severe impairment. If the claimant does not show any impairment or combination thereof which significantly limits the claimant's physical or mental ability to perform work activities, then no severe impairment is shown and the claimant is not disabled. Id. Third, if the impairment meets

or equals one of the listed impairments of Appendix 1, Subpart P, Regulation 4, the claimant is disabled regardless of age, education or work experience. Id. Fourth, if the impairment does not meet the criteria above but is still a severe impairment, then the ALJ reviews the claimant's residual functional capacity (RFC) and the physical and mental demands of work done in the past. If the claimant can still perform that work, then a finding of not disabled is mandated. Id. Fifth, if the claimant has a severe impairment but cannot perform past relevant work, then the ALJ will consider whether the applicant's residual functional capacity, age, education, and past work experience enable the performance of other work. If so, then the claimant is not disabled. Id. In this case, the ALJ's determination was made at the fifth step.

## IV. FACTS AS STATED IN THE RECORD

The Plaintiff was 51 years old at the time of the ALJ hearing. [T. 78, 402]. The Plaintiff completed the ninth grade and tried, but failed, to obtain a GED. [T. 406]. He repeated the first and second grades and was in special education classes for reading. [T. 414]. The last book he read was three years ago, and he reads the newspaper rarely. [T. 415].

The Plaintiff testified that he lives with his girlfriend and two children. [T. 407]. He testified that he receives Medicaid under the Aid to the Disabled-Medical Assistance program. [T. 162]. The Plaintiff testified that he regularly

4

drives 20 to 25 minutes taking his girlfriend to work. [T. 408]. He stated that his average day is spent at home, trying to do chores. He stated that it takes him two hours to wash a meal's dishes because he cannot stand more than 15 minutes at a time before his legs hurt and he gets out of breath. [T. 415]. The Plaintiff reported taking "Aleve and everything else" for pain, but that medication does not really help. [T. 416]. He stated that he elevates his legs in his recliner two or three times a day to relieve pain. [T. 417]. In terms of lifting, the Plaintiff reported that he can lift a sofa but can go only two or three steps before setting it down due to pain. [T. 417-8]. The Plaintiff testified that he has pain in his back, neck, legs, and feet. [T. 418].

The Plaintiff's last reported earnings were from Amran in 2004; most of his past work consisted of tree work, and much of that was paid on a cash basis and not reported. [T. 409, 414]. He testified that he was fired from Amran because he could not work a chainsaw more than five minutes before hurting. [T. 410]. He was not engaged at the time of the hearing in any substantial gainful activity. [Id.].

The Plaintiff testified that he is disabled primarily by emphysema and high blood pressure. [T. 411]. He reported that in 2000, he was struck in the head by a large, 30-foot long limb, which left a scar from the back of his head to the front. [T. 411-12]. He reported that he was knocked out for about five

5

minutes. He further stated that the injury required stitches but that he was not hospitalized.[1] [T. 412]. The Plaintiff testified that since this incident, he has been forgetful and has had frequent neck pain and headaches. [T. 412-3].

The medical treatment Plaintiff has had focuses on breathing issues, chest pain, stomach/abdominal issues, and neck pain. Because Plaintiff does not appeal from any of the ALJ's rulings regarding his physical impairments or limitations therefrom, the record of those will not be discussed.

With respect to the Plaintiff's mental limitations, the record evidence is as follows. The Plaintiff established care with Dr. Laurence So of Andrews Internal Medicine on November 3, 2005. At that time, Dr. So noted that the Plaintiff appeared quite anxious and suffered from fatigue of uncertain etiology. [T. 281-2]. On November 17, 2005, the Plaintiff presented to Dr. So complaining of anxiety, stress, and sleeplessness. Dr. So diagnosed the Plaintiff with insomnia and provided him samples of Rozarem. [T. 280]. On December 9, 2005, Plaintiff told Dr. So that friends and associates were noticing he had problems with his memory. The Plaintiff stated that he forgets dates and episodes, but not names or objects. The Plaintiff further reported having stress at home due to the addition of another child. He reported being

---

[1]There is no evidence in the administrative record of any medical treatment from this incident.

6

irritable and unable to sleep more than three hours at a time. He further reported a history of two closed head injuries without loss of consciousness but with nausea and headaches that cleared within 24 hours. [T. 278]. Dr. So diagnosed him with mild to moderate cognitive dysfunction, with a questionable relationship to either a closed head injury or mood disorder. [T. 279]. A brain MRI ordered to evaluate Plaintiff's cognitive dysfunction had normal results. [T. 165].

On January 6, 2006, the Plaintiff presented to Dr. So complaining of indigestion, nearly daily diarrhea, memory problems, chronic fatigue, and being easily angered. Dr. So noted that Plaintiff's mood and affect were normal. The Plaintiff was diagnosed with anxiety and depression, and with subjective memory loss probably secondary to those conditions. [T. 276]. He was prescribed Effexor. [T. 277]. On February 10, 2006, the Plaintiff reported some improvement from the Effexor, but he complained of the medication's side effects. He also reported sleeping poorly. In response to the Plaintiff's complaints, Dr. So switched his medication to Wellbutrin. Dr. So opined that the origin of his cognitive dysfunction was either genetic or depression. He referred the Plaintiff to Dr. Kyle Raque for "psyche testing." [T. 274-5].[2]

---

[2]It is noted that the administrative record contains no notes from Dr. Raque or any other mental health counselor.

On March 10, 2006, the Plaintiff reported to Dr. So that he had stopped taking Wellbutrin because of the side effect of nausea. [T. 272]. No further medication was prescribed for depression or anxiety at that time. On April 10, 2006, Dr. So noted that the Plaintiff was pleasant, in no acute distress, and improving with his depression and anxiety, even without medication. [T. 270-1]. By May 5, 2006, there was no reference to mental impairments other than the possibility that anxiety was contributing to his hypertension. Dr. So rated the Plaintiff's psyche as "alerted and oriented x3," and his mood and affect were noted to be normal. [T. 268].

On June 1, 2006, the Plaintiff filled out a form for his gastroenterologist Dr. Mock, indicating he did not have anxiety or depression, but did have sleeping problems. Dr. Mock's exam notes indicate a normal psychiatric and neurologic presentation. [T. 259, 258].

In an August 25, 2006 treatment note, Dr. So indicated that the Plaintiff's gastrointestinal problems had been identified as gastritis, esophagitis, and colon polyps. While the Plaintiff's psyche ratings were the same, and no emotional or intellectual symptoms or complaints were noted, Dr. So diagnosed the Plaintiff with depression and anxiety. He prescribed Cymbalta, a serotonin-norepinephrine reuptake inhibitor. [T. 267]. In a September 8, 2006 treatment note, Dr. So noted that the Plaintiff had stopped taking

8

Cymbalta two days before due to side effects. No replacement medication was prescribed. [T. 265].

On March 30, 2007, the Plaintiff reported to Dr. So that he was having increased depression and anxiety due to a home situation. His psyche ratings were normal. He was restarted on Cymbalta. [T. 262].

Medication lists of record show that the Plaintiff purchased only 64 days' worth of medication for mental impairments during the period of November 3, 2005 to May 22, 2007. [T. 139, 173, 283-4]. The two medication lists he filled out as part of his Social Security benefit application process show no medications relating to mental impairments.

Other evidence of mental impairments include criminal charges of harassing phone calls, communicating threats, assault on a female, and felony larceny, misdemeanor breaking and entering, all issued during the period of 1974 to 1996. [T. 175-178]. The physical disability examination by Dr. Frank Wood on March 8, 2005 includes an indication that Plaintiff has a normal affect, no signs of depression or agitation, and "an IQ in the 100 range," with no indication of the basis of that particular conclusion. [T. 180].

In September 2005, just before Plaintiff initiated a primary care relationship with Dr. So, Plaintiff was evaluated for mental impairments by Dr. Karen Marcus at the office of his attorney. [T. 214-26]. During the course of

9

the evaluation, the Plaintiff described functional limitations related to his emphysema. [T. 215]. He denied any history of mental health treatment. [T. 216]. Although Plaintiff reported hearing somebody calling his name, he denied any actual problems with hallucinations, delusions, or symptoms of psychosis. [T. 216]. He reported helping with household chores but noted that doing so took him a long time because he becomes short-winded. [T. 216].

Dr. Marcus indicated that Plaintiff looked depressed and appeared stressed or in pain. [T. 216]. She also noted, however, that the Plaintiff's appearance was relaxed; his speech was appropriate; and that he was "friendly and comfortable." [T. 216-17]. She further opined that the Plaintiff presented a "happy face" which possibly did not reflect his true feelings. [T. 217].

Dr. Marcus opined that the Plaintiff had a tendency to give up easily on tasks and that he was capable of more than what was reflected by the test results. [T. 217]. On WAIS-III testing, the Plaintiff achieved a verbal IQ of 71, a performance IQ of 72, and a full scale IQ of 69. [T. 217]. His working memory score of 80 was in the low average range which, according to Dr. Marcus, "implies a rather strong ability to hold information in mind and simultaneously process it." [T. 217-18]. Dr. Marcus further indicated that

Plaintiff's academic problems may not have been about capability [T. 216], and she reported that his actual capability seemed to exceed what the IQ numbers showed [T. 225].

In a form entitled "Mental Residual Functional Capacity Questionnaire," Dr. Marcus noted that the Plaintiff was unable to perform the following work activities on a sustained basis in a regular work setting: carry out very short and simple instructions, maintain attention for a two-hour segment, work in coordination with or proximity to others without being unduly distracted, make simple work-related decisions, complete a normal workday and workweek without interruptions from psychologically based symptoms, accept instructions and respond appropriately to criticism from supervisors, deal with normal work stress, understand and remember detailed instructions, carry out detailed instructions, and deal with stress of semiskilled and skilled work. [T. 223-25]. She noted that the Plaintiff had a limited, but satisfactory, ability to remember work-like procedures; to maintain regular attendance and be punctual; to sustain an ordinary routine without special supervision; to get along with co-workers and interact appropriately with the public; to be aware of normal hazards and take precautions; to set realistic goals and make independent plans; to adhere to basic standards of neatness and cleanliness; to travel in unfamiliar places; and to use public transportation. [T. 224-25].

11

Dr. Marcus concluded her evaluation by suggesting the following diagnoses: "Mood Disorder, NOS; Undifferentiated Somatization Disorder; Learning Disorder, NOS; and Substance Abuse, full sustained remission per report" of the Plaintiff. In her diagnosis, Dr. Marcus ruled out Bipolar Disorder, Post-Traumatic Stress Disorder, and Cognitive Disorder. [T. 221].

## V.    THE ALJ'S DECISION

On February 29, 2008, the ALJ issued a decision denying the Plaintiff's claim. [Tr. 10-31]. Proceeding to the first step of the sequential evaluation, the ALJ found that the Plaintiff's date last insured ("DLI") was June 30, 2002, and that he had not engaged in any substantial gainful activity since June 1, 2002, the alleged onset date. [Tr. 15]. While the ALJ noted some work attempts since the alleged onset date, he found that none of these constituted substantial gainful activity.[3]

Proceeding to the second step of the sequential evaluation process, the ALJ found that the medical evidence established degenerative disease of the cervical and lumbar spine, chronic obstructive pulmonary disease, and hypertension to be severe impairments. [T. 15]. The ALJ concluded, however, that the Plaintiff's mental impairments were not severe. [T. 17]. The

---

[3]The ALJ did note, however, that these work attempts contradicted Plaintiff's claims regarding the extent of his disability. [T. 15].

12

ALJ concluded that none of the Plaintiff's impairments, alone or in combination, met a listing. [T. 16].

The ALJ then assessed Plaintiff's residual functional capacity and determined that the Plaintiff retained the capacity to lift and carry up to 50 pounds occasionally and 25 pounds frequently, to sit for six hours, and to stand and walk for seven hours, and needed to avoid concentrated exposure to fumes, odors, dusts, and gases. [T. 17]. In light of these limitations, the ALJ found that the Plaintiff was unable to perform his past relevant work as a tree trimmer and chain saw operator. [T. 29].

At step five of the sequential evaluation process, the ALJ obtained vocational expert testimony and concluded that there was significant work in the national economy that the Plaintiff could perform. Accordingly, the ALJ concluded that the Plaintiff was not "disabled" as defined by the Social Security Act. [T. 29-30].

## VI. DISCUSSION

Plaintiff raises two assignments of error. First, the Plaintiff contends that the ALJ erred in finding that Plaintiff had no severe mental impairments. Second, the Plaintiff contends that the ALJ erred in ignoring the state agency's findings. These will be addressed *seriatim.*

## A. The ALJ applied proper legal standards and was supported by substantial evidence in his steps two and four determination on mental impairments, including his weighing of physician evidence.

At step two of the sequential evaluation process, a claimant must show the existence of a medically determinable impairment that is severe. 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is an impairment or combination of impairments that significantly limits a claimant's physical or mental ability to do basic work activities. See 20 C.F.R. §§ 404.1521(a), 416.921(a). "Basic work activities" are abilities and aptitudes necessary to do most jobs, including physical functions such as walking, standing, sitting, lifting, carrying, reaching and handling; capacities for seeing, hearing, and speaking; the ability to understand, remember and carry out simple instructions; and the ability to use judgment, to respond appropriately to supervision, co-workers and usual work situations, and to deal with changes in a routine work setting. 20 C.F.R. §§ 404.1521(b), 416.921(b). A severe mental impairment "must result from . . . psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1508. A claimant's statement of psychological symptoms is not sufficient to establish a mental impairment. Id.

As one court has explained, the burden on a claimant at step two "is not an exacting one":

> Although the regulatory language speaks in terms of "severity," the Commissioner has clarified that an applicant need only demonstrate something beyond "a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28. Any doubt as to whether this showing has been made is to be resolved in favor of the applicant. In short, "[t]he step-two inquiry is a de minimis screening device to dispose of groundless claims." Due to this limited function, the Commissioner's determination to deny an applicant's request for benefits at step two should be reviewed with close scrutiny. We do not suggest, however, that a reviewing court should apply a more stringent standard of review in these cases. The Commissioner's denial at step two, like one made at any other step in the sequential analysis, is to be upheld if supported by substantial evidence on the record as a whole. Instead, we express only the common-sense position that because step two is to be rarely utilized as basis for the denial of benefits, its invocation is certain to raise a judicial eyebrow.

McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360 (3d Cir. 2004) (internal citations omitted).

The Disability Insurance Benefits (DIB) portion of this claim requires the Plaintiff to meet his burden of proving a disabling mental impairment prior to June 30, 2002, his date last insured (DLI). Review of the record indicates no evidence whatsoever of a medically determinable mental impairment prior to the September 19, 2005 evaluation by Dr. Marcus. Thus, as to the Title II claim for DIB benefits, the there is substantial evidence to support the ALJ's

15

determination that the Plaintiff does not have a severe mental impairment.

As to the Title XVI claim for SSI benefits, the Court must consider evidence of disabling mental impairments dated through the time of the ALJ hearing. The only relevant evidence in this regard is that discussed above from the records of Dr. So, an internist, and the evaluation of Dr. Marcus. Based on Plaintiff's subjective complaints, Dr. So had diagnosed the Plaintiff with depression and anxiety and had prescribed the Plaintiff various medications, which were unilaterally discontinued by the Plaintiff without consultation. Significantly, it does not appear from Dr. So's records that Plaintiff's subjective complaints of depression and anxiety lasted for a period of twelve months. As such, these conditions do not qualify for consideration as disabling conditions.

While Dr. Marcus identified some disabling limitations, the ALJ correctly noted that her opinion is inconsistent with the other medical evidence of record. [T. 28-29]. Specifically, Dr. Marcus opined that some of the Plaintiff's deficits could be due to an accident that resulted in a concussion; however, the medical evidence of record does not indicate that the Plaintiff actually suffered from a concussion. She further opined that the Plaintiff likely had problems with Post-Traumatic Stress Disorder, although the Plaintiff had never alleged any symptoms consistent with such a diagnosis. Further, Dr.

Marcus's opinion that the Plaintiff could not meet competitive standards in maintaining attention for a two-hour segment is contradicted by the fact that her own evaluation took two and a half hours to complete, and no problems were noted in the Plaintiff maintaining attention for this period of time. For these reasons, the ALJ did not err in giving Dr. Marcus's assessment little weight.

As the ALJ found, the medical evidence of record does not show, and the Plaintiff does not claim, any limitation on his work or life activities as a result of any mental impairments. [T. 411-12, 422-3]. Indeed, in his testimony before the ALJ, the Plaintiff attributed any limitations that he does have to his *physical* impairments. [T. 411-12]. For these reasons, the Court concludes that the ALJ followed the applicable legal standards in determining that the Plaintiff had no severe mental limitations, and that this determination is supported by substantial evidence.[4]

**B.    The ALJ's failure to expressly explain his reasons for discounting the decision of the North Carolina Department Health and Human Services to award the Plaintiff Medicaid benefits is not reversible error.**

Under the regulations, disability decisions by other governmental

---

[4]Assuming *arguendo* that the ALJ erred in failing to find a severe mental impairment, such error was harmless. As the Defendant thoroughly discusses in his brief [Doc. 16], the ALJ did consider the Plaintiff's mental limitations at steps three, four, and five of the sequential evaluation process. The Court finds that the ALJ's findings at these steps are supported by substantial evidence.

agencies are not binding on the Social Security Administration. 20 C.F.R. §§ 404.1504, 416.904. While not binding, such disability determinations are "entitled to consideration by the Secretary." DeLoatche v. Heckler, 715 F.2d 148, 150 n.1 (4th Cir. 1983); Watson v. Astrue, No. 5:08-CV-553-FL, 2009 WL 2423967, at *2 (E.D.N.C. Aug. 6, 2009) (remanding case where ALJ failed to discuss state agency decision).

Plaintiff testified at the hearing that he receives Medicaid benefits. Of record is the October 18, 2005 decision of Hearing Officer Stewart of the North Carolina Department of Health and Human Services granting benefits to the Plaintiff effective December 2004 pursuant to his application for Aid to the Disabled-Medical Assistance. [T. 162]. In granting the Plaintiff benefits, the Hearing Officer noted that "Section 2300 of the Medicaid Eligibility Manual requires that an applicant meet the Supplemental Security Income Standards found at 20 CFR 416 in order to [be] eligible for Aid to the Disabled-Medical Assistance." [Id.]. He then determined that Plaintiff "meets the disability requirement referenced in the foregoing (20 CFR.920(f), Appendix I, Listing 12.08)." [Id.].

The ALJ obliquely referred to this decision in noting that he considered the opinion evidence of record "in accordance with the requirements of ... [SSR] 06-3p." [T. 17]. Social Security Ruling 06-03p guides the Secretary's

18

implementation of 20 C.F.R. § 404.1504, which identifies Medicaid decisions as "other-agency evidence" and specifies that "the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases." SSR 06-03p at *7. There is, however, no other evidence of record which would have qualified for consideration under SSR 06-03p. Therefore, the Court must conclude that the ALJ's reference to that Ruling indicates that he considered the state Medicaid decision.

Although the record contains no explanation by the ALJ as to why he discounted the state Medicaid decision, such failure was harmless. The only mental health evidence to support the state Medicaid decision was Dr. Marcus's assessment. The ALJ, however, specifically evaluated Dr. Marcus's opinion and for the reasons stated herein, properly determined that it was entitled to little weight. The ALJ's thorough analysis of Dr. Marcus's opinion indicates that more robust compliance with SSR 06-03p here would not have changed the ALJ's ultimate decision. Thus, the Court concludes that to the extent that the ALJ's failure to explain his consideration of the state Medicaid decision more thoroughly may have been error, it was harmless error.

## VII. CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ applied the

correct legal standards and that there is substantial evidence to support the ALJ's determination that the Plaintiff has not been disabled since January 10, 2005, the protective filing date, within the meaning of the Social Security Act.

## O R D E R

Accordingly, **IT IS, THEREFORE, ORDERED** that the Plaintiff's Motion for Summary Judgment [Doc. 13] is **DENIED**; the Defendant's Motion for Summary Judgment [Doc. 15] is **GRANTED**; and the Commissioner's decision is hereby **AFFIRMED**.

**IT IS FURTHER ORDERED** that this case is **DISMISSED WITH PREJUDICE**, and judgment shall issue simultaneously herewith.

**IT IS SO ORDERED.**

Signed: September 14, 2011

Martin Reidinger
United States District Judge